UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

STEPHEN R. BUSBY,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-06928-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 23, 24.

## INTRODUCTION

The plaintiff seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title XVI of the Social Security Act.[1] He moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge

---

[1] Mot. for Summary Judgment – ECF No, 23 at 5. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF. No. 23.

[3] Cross-Mot. – ECF No. 24.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On April 16, 2014, the plaintiff, then age 47, filed a claim for social-security disability insurance ("SSDI") benefits under Title XVI of the Social Security Act ("SSA").[5] He alleged a gunshot wound to the left leg, a lower-back injury, and depression with an onset date of March 1, 2001.[6] The Commissioner denied his SSDI claim initially and on reconsideration.[7]

Administrative Law Judge Suzanne Krolikowski ("the ALJ") held a hearing in San Rafael, California on May 4, 2016.[8] The plaintiff was represented by an attorney.[9] The ALJ heard testimony from the plaintiff and from vocational expert ("VE") Connie Guillory.[10] On September 23, 2016, the ALJ issued an unfavorable decision.[11] The plaintiff appealed the decision to the Appeals Council on October 18, 2016.[12] The Appeals Council denied his request for review on October 5, 2017.[13]

---

[4] Consent Forms – ECF. Nos. 9, 10.

[5] AR 190–98. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[6] AR 190, 77.

[7] AR 77–86 (initial determination); AR 88–99 (reconsideration).

[8] AR 35–76.

[9] AR 37.

[10] AR 45, 68.

[11] AR 14.

[12] AR 189.

[13] AR 1–6.

The plaintiff filed this action on December 4, 2017 and moved for summary judgment on October 26, 2018.[14] The Commissioner opposed the motion and filed a cross-motion for summary judgment on November 23, 2018.[15]

## 2. Summary of Medical Records

### 2.1   Clarence David, M.D. — Treating

Dr. David treated the plaintiff in San Quentin State Prison on several occasions from August 28, 2013 to July 23, 2014.[16] Dr. David treated the plaintiff for multiple conditions, including chronic intermittent low-back pain, chronic axial low-back pain, hypertension, and right-wrist-thumb discomfort.[17]

Beginning on April 24, 2013, Dr. David noted low-back pain with pain shooting down the plaintiff's right leg.[18] The plaintiff reported on July 23, 2013 that medication was not easing his pain, and his low back pain continued.[19] He also reported that he had pain in his entire body from his neck down to his left leg.[20] Dr. David noted that the plaintiff had full strength (rated five out of five) in his upper and lower extremities and deep-tendon reflexes 2+ bilaterally.[21] On August 28, 2013, the plaintiff complained about continuing low-back pain and shooting pain in his leg.[22] Dr. David noted that the plaintiff's symmetrical strength was five out of five in the upper and lower

---

[14] Compl. – ECF. No. 1; Mot. – ECF. No. 23.

[15] Cross-Mot. – ECF. No. 24.

[16] AR 280, 282, 287, 289, 291, 293.

[17] AR 280, 282, 287, 289, 291, 293, 306.

[18] AR 306, 293, 291.

[19] AR 293.

[20] *Id.*

[21] *Id.* Deep-tendon reflex tests are used to determine the integrity of the spine and peripheral nervous system. The response levels of deep-tendon reflexes are level 0-4+, with 2+ being normal. Alexander Reeves and Rand Swenson, *Disorders of the Nervous System: A Primer*, DARTMOUTH MEDICAL SCHOOL, https://www.dartmouth.edu/~dons/part_1/chapter_8.html (last visited Mar. 12, 2019).

[22] AR 291.

extremities, deep tendon reflexes were 2+ bilaterally, and his gait was normal.[23] Dr. David reported chronic low-back pain with some parethesias, but no neurologic or motor deficits.[24]

On September 16, 2013, Dr. David evaluated the plaintiff for right-wrist pain.[25] The plaintiff's low-back pain was "doing much better with the Tylenol."[26] Dr. David evaluated the plaintiff's wrist and concluded there was "no point tenderness, but some discomfort over the base of his thumb."[27] There was no soft-tissue swelling, there was a prominent radial head, but no deformity, and there was no crepitus or effusion.[28] The plaintiff complained of wrist pain on November, 20, 2013, December 21, 2013, January 15, 2014, and February 26, 2014.[29] On February 26, 2014, Dr. David noted that there were no bony abnormalities shown in the x-rays, and he prescribed a wrist splint.[30]

Dr. David treated the plaintiff for hypertension via medication and monitoring.[31] On July 23, 2013, the plaintiff's blood pressure was "mildly elevated."[32] On August 28, 2013, it was "mildly increased."[33] On November 20, 2013 and January 14, 2015, his blood pressure was "well controlled."[34]

---

[23] *Id.*

[24] *Id.* Parethesias refers to a burning or prickling sensation usually felt in the arms, legs, or feet. NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited Mar. 12, 2019).

[25] AR 289.

[26] *Id.*

[27] *Id.*

[28] *Id.* Crepitus of the knee is a cracking, popping, or crunching sensation that takes place upon movement of the knee. Brian Wu, *What's to Know About Crepitus of the Knee?* MEDICAL NEWS TODAY (Aug. 30, 2018), https://www.medicalnewstoday.com/articles/310547.php (last visited Mar. 12, 2019).

[29] AR 287, 285, 282, 280.

[30] AR 280.

[31] AR 282, 287, 293, 291.

[32] AR 293.

[33] AR 291.

[34] AR 287, 282.

### 2.2  R. Ponath, PsyD — Treating

Dr. Ponath treated the plaintiff in San Quentin State Prison for depression.[35] On April 5, 2013, Dr. Ponath noted that the plaintiff was ambulating in an "impaired manner consistent with pain complaint."[36] Dr. Ponath prescribed the plaintiff an increased dosage of venlafaxine (for his depression) continued hydroxyzine (for his anxiety).[37] On November 7, 2013, Dr. Ponath noted that the plaintiff's chronic back pain "limits him and causes him depression and anxiety over his condition."[38] After a suicide-risk evaluation conducted on November 7, 2013, Dr. Ponath noted that the plaintiff was "doing well [and had] less depression and anxiety."[39]

### 2.3  Clinician H. Taylor — Treating

On January 10, 2014, Dr. Taylor treated the plaintiff in San Quentin State Prison.[40] The plaintiff reported that he was always in pain but tried not to think about it.[41] The plaintiff also reported that his antidepressant worked fairly well.[42] Dr. Taylor noted that the plaintiff's affect was full range and appropriate and his cognitive function was intact.[43]

### 2.4  Carla Schwarz, ASW — Treating

On April 3, 2014, Ms. Schwartz stated in her pre-release notes that the plaintiff was feeling positive and future-oriented about his release.[44] Mental health was "not a concern" for him, and he

---

[35] AR 295.

[36] *Id.*

[37] *Id.*

[38] AR 296.

[39] AR 302.

[40] AR 305.

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] AR 304.

was "feeling blessed."[45] Ms. Schwarz noted that the plaintiff had anxiety and depression but was no longer taking any medications for mental health.[46]

### 2.5 Samuel S. Chua, M.D. — Treating

Dr. Chua treated the plaintiff from June 2014 to June 2016.[47]

On June 16, 2014, Dr. Chua assessed the plaintiff for depression, hypertension, causalgia of the lower limb, and lesion of femoral nerve.[48] The plaintiff reported that he wanted to get back on his blood-pressure medication.[49] Dr. Chua noted that the plaintiff's leg pain was at an eight out of ten, occurred constantly, and was worsening.[50] He also noted that the plaintiff's back pain was at an eight out of ten, was worsening, and occurred persistently.[51] Dr. Chua added that the plaintiff's back may have been subjected to an unusual strain as a result of the plaintiff's walking with a limp due to weakness and neuralgic pain in the left leg.[52]

Dr. Chua performed a physical exam of the plaintiff. He stated that the plaintiff's gait was antalgic and his posture had lumbar prominence.[53] Furthermore, the plaintiff's muscle tone in the lower extremity was diminished on the left side and that he moved "with pain."[54] The plaintiff had an increased lumbar paraspinal on the left, a lumbar spasm, and paraspinous lumbar tenderness; his right buttock was painless while his left was painful, his greater trochanter on the right and left

---

[45] *Id.*

[46] *Id.*

[47] AR 322–361, 408–413.

[48] AR 327.

[49] *Id.*

[50] AR 328.

[51] *Id.*

[52] *Id.*

[53] AR 330. Antalgic gait is a limp that develops as a result of a person taking uneven strides in response to pain. Kanna Ingleson, *All You Need to Know About Antalgic Gait,* MEDICAL NEWS TODAY (Oct. 26, 2017), https://www.medicalnewstoday.com/articles/319829.php (last visited Mar. 12, 2019).

[54] *Id.*

were painless, and the sacroiliac joint in the left was painless. [55] Dr. Chua prescribed the plaintiff felodipine (for hypertension), fluoxetine (for depression), hydrocodone-acetaminophen (for pain), Irbesartan (for hypertension), hydrochlorothiazide (for hypertension), and Neurontin (for pain).[56]

On August 13, 2014, Dr. Chua ordered lab tests for the plaintiff including a lipid panel, urinalysis, TSH (thyroid-stimulating hormone), CBC (complete blood count) with differential, Vitamin D, 25-Hydrocy, and CMP (comprehensive metabolic panel).[57] The results of these tests included findings that CBC and CMP were within normal limits, lipid panel was elevated, Vitamin D was low at 14, and the urinalysis was positive for leukocyte esterase, but negative for nitrite.[58]

On September 10, 2014, Dr. Chua assessed the plaintiff for hypertension, depression, causalgia of lower limb, and high cholesterol.[59] The plaintiff had anxiety and back pain.[60] He prescribed atorvastatin (for cholesterol), felodipine (for hypertension), fluoxetine (for depression), hydrocodone-acetaminophen (for pain), irbesartan (for hypertension), hydrochlorothiazide (for hypertension), Neurontin (for pain), and Vitamin D3.[61]

On October 29, 2014, Dr. Chua noted that the plaintiff's depression had "good improvement" on fluoxetine.[62] The plaintiff reported functioning as "somewhat difficult" and presented with fatigue and decreased libido.[63] The plaintiff's hypertension was controlled, and no changes were made to medications and monitoring.[64] There was "good relief" of causalgia of lower limb with

---

[55] *Id.* The paraspinal muscles are a set of three back muscles which function to extend and bend the spine. Anne Asher, *What Are the Paraspinal Muscles?* VERYWELL HEALTH (Nov. 19, 2018), https://www.verywellhealth.com/paraspinal-muscles-297191 (last visited Mar. 12, 2019).

[56] AR 330.

[57] AR 358.

[58] AR 333. A positive finding of leukocyte esterase in the urine is indicative of an infection. *Leukocyte Esterase*, UCSF HEALTH, https://www.ucsfhealth.org/tests/003584.html (last visited Mar. 25, 2019).

[59] AR 332.

[60] AR 334.

[61] AR 334–35.

[62] AR 336.

[63] *Id.*

[64] *Id.*

his combination of medication.[65] Dr. Chua described the plaintiff's pain as "fluctuating" and "throbbing."[66] His pain was aggravated by climbing and descending stairs, movement, walking, and standing.[67] The pain was relieved by exercise, heat, ice, pain medication and mobility.[68] Dr. Chua prescribed astorvastin (for cholesterol), felodipine (for hypertension), fluoxetine (for depression), hydrocodone-acetaminophen (for pain), irbesartan (for hypertension), hydrochlorothiazide (for hypertension), Neurontin (for pain), Vitamin D3, and Viagra (for erectile dysfunction).[69]

On April 24, 2015, Dr. Chua indicated that the plaintiff's hypertension was "mild-moderate" and was currently stable.[70] He also noted that the plaintiff continued to have symptoms of causalgia of the lower limb and that it was in "fairly good control with gabapentin and narcotic pain meds."[71] He noted that the severity level of leg pain was a level eight out of ten and that it was improving.[72] Dr. Chua prescribed the plaintiff atorvastatin (for cholesterol), Chantix (for smoking cessation), felodipine (for hypertension), fluoxetine (for depression), fluticasone (for pain), hydrocodone-acetaminophen (for pain), irbesartan (for hypertension), hydrochlorothiazide, Neurontin (for pain), Viagra (for erectile dysfunction), and Vitamin D3.[73]

On September 2, 2015, Dr. Chua noted that the plaintiff's hypertension was mild and did not make any changes to medication and monitoring of the hypertension.[74] With regard to the plaintiff's leg pain, Dr. Chua indicated that the severity level was a level eight out of ten and that it

---

[65] *Id.*

[66] AR 337.

[67] *Id.*

[68] *Id.*

[69] AR 339–40.

[70] AR 341.

[71] *Id.*

[72] AR 342.

[73] AR 344–45.

[74] AR 346–47.

occurred constantly and was worsening.[75] He also noted that the pain was aching, sharp, and aggravated by standing.[76] During this visit, the plaintiff reported that he went to the emergency room via ambulance early that morning for severe pain in his left leg.[77] The plaintiff reported that he had a fall and was "not too sure as to why he fell."[78] Dr. Chua noted that the symptoms of causalgia lower limb "may be worsening as this may be affecting the motor function of the LLE."[79] During this visit, Dr. Chua prescribed atorvastatin (for cholesterol), Chantix (for smoking cessation), felodipine (for hypertension), fluoxetine for depression), fluticasone (for pain), hydrocodone-acetaminophen (for pain), irbesartan (for hypertension), hydrochlorothiazide (for hypertension) , ketotifen (for allergies), Neurontin (for pain), Viagra (for erectile dysfunction), and Vitamin D3.[80]

On January 27, 2016, Dr. Chua did not make any changes to the plaintiff's medication or monitoring for hypertension.[81] Dr. Chua noted that, given the most recent hospitalization of the plaintiff, where he had to be placed on the ventilator for severe intoxication with narcotic medication in his system, he would never give him narcotic analgesics for his leg pain.[82] He advised the plaintiff that he violated the narcotics contract, which was grounds for discharging him from Dr. Chua's practice.[83] Dr. Chua advised the plaintiff to look for another provider as he "[could] not trust him anymore with this history."[84] The plaintiff asked for more pain medications to replace the ones he was given at the hospital and subsequently lost.[85] Dr. Chua started, stopped,

---

[75] AR 347.

[76] *Id.*

[77] *Id.*

[78] AR 348.

[79] AR 346.

[80] AR 350.

[81] AR 352.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] AR 353.

United States District Court
Northern District of California

or renewed the following medications for the plaintiff: acetaminophen, atorvastatin, azithromycin (an antibiotic), Chantix, Felodipine, fluoxetine, fluticasone, hydrocodone, irbesartan, ketotifen, Neurontin, Viagra, and Vitamin D3.[86] It is unclear from the record which medications were started, stopped, or renewed during this visit.[87]

On June 15, 2016, Dr. Chua noted that the plaintiff's hypertension was under "suboptimal control," and he reviewed and made changes to his medication and monitoring.[88] With regard to the causalgia of left lower limb, Dr. Chua noted that gabapentin was controlling the pain.[89] He also indicated that the plaintiff did not ask for any pain medication during this visit and that he told Dr. Chua that he was "functional with present level of pain control, although ambulation [was] still difficult for him.[90] Finally, during this visit, Dr. Chua encouraged the plaintiff to stop smoking.[91]

Dr. Chua completed a medical-source statement regarding the plaintiff's impairments.[92] Dr. Chua certified that the plaintiff had an impairment of "major disfunction of a joint" as defined by Listing 1.02.[93] Dr. Chua noted that the plaintiff had a "gunshot wound . . . several years ago with residual nerve injury and development of causalgia and complex regional pain syndrome."[94] He also noted that the plaintiff had undergone reconstructive surgery and that there was "no joint involved, just the r[ight] femur."[95] He indicated that the plaintiff was unable to walk a block at a reasonable pace on rough or uneven surfaces or climb several stairs at a reasonable pace.[96] He was

---

[86] AR 356–57.

[87] *Id.*

[88] AR 408.

[89] AR 409.

[90] *Id.*

[91] *Id.*

[92] AR 322.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] AR 323.

able to use standard public transportation and carry out routine ambulatory activities.[97] Dr. Chua's diagnosis of the plaintiff was causalgia of right lower extremity.[98] Dr. Chua indicated that the plaintiff's prognosis was "poor" and that the following conditions applied to him: chronic pain, chronic stiffness, chronic tenderness, limitation of motion, contracture, bony of fibrous ankylosis, quadriceps muscle atrophy, and inability to ambulate effectively.[99] He noted that depression and loss of interest in activities affected the plaintiff's physical conditions.[100]

Dr. Chua indicated that the plaintiff's pain and other symptoms were severe enough to interfere with attention and concentration needed to perform even simple work tasks.[101] According to Dr. Chua, the plaintiff could sit about two hours, stand or walk for less than two hours, and required three to four unscheduled breaks during a typical eight-hour work day.[102] He could never climb stairs or ladders, crouch, or squat and he could rarely twist or stoop.[103] Dr. Chua opined that the plaintiff would need to be absent from work more than four days per month.[104]

### 2.6   North Bay Medical Center — Treating

The plaintiff was admitted to North Bay Medical Center on January 24, 2016 and discharged on January 25, 2016.[105] He was transported there via ambulance after he fell face forward on the street while he was "extremely intoxicated with alcohol and apparent prescription medications."[106] The plaintiff was intubated because he was "unable to protect the airway and was having significant apneic episodes."[107] Laboratory and imaging tests indicated the following findings:

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] AR 324.

[101] *Id.*

[102] *Id.*

[103] AR 325.

[104] *Id.*

[105] AR 372.

[106] AR 372, 375.

[107] AR 376.

fatty infiltration of the liver, simple left renal cysts, mildly enlarged heart with normal appearance of the aorta, spine disc space narrowing from C4-C5 through C6-C7 levels, anterior and posterior osteophytes at multiple levels, and minimal degenerative changes were present within the thoracic and lumbar spine.[108]

### 2.7 Sutter Solano Medical Center — Treating

On September 2, 2015, the plaintiff arrived at Sutter Solano Medical Center via ambulance.[109] He complained of pain in his left leg and hip.[110] The plaintiff stated that his left leg "gave out" as he was walking and that he had been unable to walk on it since then.[111] An imaging study showed

> "there [were] two buckshot pellets overlying the medial aspect of the proximal thigh. The soft tissues [were] otherwise within normal limits. The bony structures [were] intact and normal and there [was] no evidence of any significant osteoarthritic change in the hip except for minor marginal osteophyte formation."[112]

X-rays were within normal limits, and the plaintiff was deemed stable for discharge.[113] Upon discharge, the plaintiff insisted on staying longer, said he could not walk on his leg, urged medical providers to "do more so [he could] walk again", and "attempted to purposely fall on the floor."[114]

On February 5, 2016, the plaintiff was treated at Sutter Solano Medical Center for complaints of chest pain.[115] The plaintiff was intoxicated.[116] Chest x-ray results showed normal heart and mediastinal contours, clear lungs, no infiltrate or vascular congestion, and no pneumothorax or pleural effusion.[117]

---

[108] AR 369, 378, 380, 384.

[109] AR 398.

[110] *Id.*

[111] *Id.*

[112] AR 396.

[113] AR 400.

[114] AR 398.

[115] AR 403.

[116] *Id.*

[117] AR 404.

### 2.8 Edie Glantz, M.D. — Examining

Dr. Glantz conducted a comprehensive internal-medicine evaluation of the plaintiff on November 14, 2014 for the plaintiff's Disability Determination.[118] The plaintiff's chief complaints were low-back pain that occasionally radiated to his left thigh, a gunshot wound to his posterior thigh, and hypertension.[119] Dr. Glantz noted that the plaintiff limped about the room and "appear[ed] uncomfortable when changing positions."[120] Dr. Glantz further noted that the plaintiff was unable to get up from a chair without pushing up with his arms due to his low-back pain and left-thigh pain.[121] Dr. Glantz observed that the plaintiff was able to get his jacket on over his head, manipulate a paperclip with both hands, and pick it up from the table without difficulty.[122] Dr. Glantz noted that the plaintiff had antalgic gait.[123] Dr. Glantz also observed that the plaintiff limped and favored his left leg.[124] Dr. Glantz reported that the plaintiff had difficulty standing on his heels, particularly with the left leg, and that his tandem gait was mildly impaired.[125]

Dr. Gantz diagnosed the plaintiff with a left-thigh gunshot wound with muscular injury, weakness of the left hamstring with chronic pain, low-back pain, hypertension, and hypercholesterolemia.[126] Dr. Gantz's functional assessment stated that the plaintiff's maximum standing and walking capacity was four hours.[127] He also indicated that the plaintiff's standing and walking capacity was limited by his left-hamstring injury status post-gunshot wound with

---

[118] AR 315.

[119] *Id.*

[120] AR 316.

[121] *Id.*

[122] *Id.*

[123] AR 317.

[124] *Id.*

[125] *Id.*

[126] AR 318.

[127] *Id.*

United States District Court
Northern District of California

weakness and chronic pain.[128] Dr. Glantz's assessment indicated that the plaintiff could lift twenty pounds occasionally and ten pounds frequently, limited by his low-back pain.[129]

### 2.9   J. Zheutin, M.D. — Non-Examining

On June 19, 2014, Dr. Zheutin conducted a Disability Determination Explanation.[130] His assessment indicated that that the plaintiff could only occasionally lift or carry up to twenty pounds and frequently lift ten pounds.[131] He noted that the plaintiff could stand, walk, or sit for about six hours in an eight-hour workday.[132] He also noted that the plaintiff could climb stairs frequently and ladders occasionally.[133] He added that the plaintiff could balance, kneel, crawl, and crouch frequently.[134]

### 2.10   F. Greene, M.D. — Non-Examining

On October 15, 2014, Dr. Greene completed a Disability Determination Explanation at the reconsideration level.[135] He affirmed Dr. Zheutin's findings and concluded that the plaintiff was limited to lifting or carrying twenty pounds occasionally and ten pounds frequently.[136]He also indicated that the plaintiff could stand, walk, or sit for a total of six hours during an eight-hour day.[137] He opined that the plaintiff could climb ramps and stairs, balance, kneel, crouch, and crawl frequently while he could climb ladders and stoop occasionally.[138]

---

[128] *Id.*

[129] AR 319.

[130] AR 83–86.

[131] AR 83.

[132] *Id.*

[133] AR 84.

[134] *Id.*

[135] AR 95–97.

[136] AR 96.

[137] *Id.*

[138] *Id.*

United States District Court
Northern District of California

### 3. Administrative Proceedings and Findings

#### 3.1 The Plaintiff's Testimony

A hearing was held before the ALJ on May 4, 2016.[139] She asked the plaintiff about his education and prior work experience.[140] The plaintiff testified that he had a GED.[141] He formerly worked at a refinery, but he did not remember the dates he worked there.[142] He had not worked for pay or profit at any time since April 16, 2014.[143]

The plaintiff's injury stemmed from a gunshot wound.[144] He was shot during a car-jacking and he still had pellets in his back, near his spinal cord.[145] The ALJ asked the plaintiff what prevented him from working.[146] He testified that he had pain in his back, leg, and entire left side, which was "hurting real bad" and kept him from working.[147] If he tried to work, he would "start hurting so bad and hurt the next day" that he "couldn't even make the job if he wanted to go."[148] If he "strain[ed] [his] body too hard," it "locked up" and caused pain.[149] He took the hydrocodone-acetaminophen his doctor prescribed as needed every four to six hours, gabapentin three times per day, and fluoxetine once per day.[150] He had not had any side effects from the medications.[151] He used a cane sometimes when he had pain.[152] The plaintiff was transported mostly by family or

---

[139] AR 37.

[140] AR 47.

[141] *Id.*

[142] AR 48.

[143] *Id.*

[144] AR 56.

[145] AR 56, 66–67.

[146] AR 49.

[147] *Id.*

[148] AR 50.

[149] *Id.*

[150] AR 50, 52–53.

[151] AR 54.

[152] *Id.*

friends, but took public transportation "every now and again" a few years ago.[153] He believed his mental-health problems worsened since he left prison, and he was working with his doctor to improve it.[154]

The ALJ asked the plaintiff what he did during the day.[155] The plaintiff testified that he was homeless and sometimes stayed with his mother, aunt, or sister.[156] When he was stayed at his mother's home, he was able to take out the garbage "now and then."[157] He did not do laundry or wash the dishes.[158] He did not do grocery shopping, but he did buy food for himself, such as sandwiches and chips.[159] He also went to church with his mother.[160] While at church, he needed to stand and walk around every fifteen or twenty minutes for two to three minutes at a time.[161] He was able to walk for about ten minutes before experiencing pain.[162]

The plaintiff smoked about five cigarettes per day and was trying to quit.[163] He testified that he stopped drinking alcohol six months to a year before the date of the hearing.[164]

His attorney asked the plaintiff what was the biggest issue keeping him from work.[165] The plaintiff said that his leg, back, and neck hurt.[166] He said that he still had pellets in his back and that he did not want to undertake the risk of spinal surgery to remove them.[167]

---

[153] AR 55.

[154] AR 57–58.

[155] AR 58.

[156] AR 46.

[157] AR 59.

[158] *Id.*

[159] *Id.*

[160] AR 60.

[161] *Id.*

[162] AR 62.

[163] AR 62–63.

[164] AR 63.

[165] AR 66.

[166] *Id.*

[167] AR 66–67.

### 3.2   Vocational Expert Testimony — Connie Guillory

VE Connie Guillory testified at the May 4, 2016 hearing. The ALJ posed a hypothetical to the VE:

> Assuming a hypothetical individual of the claimant's age and education and with the past jobs that you described, further assume that this individual is limited to light work as defined in the regulations, except frequent balance, kneel, crouch, crawl, and climb ramps and stairs, occasional stoop and climb ropes, ladders and scaffolds. Can the hypothetical individual perform any work, and if so, could you give me a few examples with numbers of jobs for each occupation?[168]

The VE responded that the hypothetical individual could be a hand packer, a folder, or a light-duty cleaner.[169] There were 100,000 jobs nationally for hand-packer (559.687-074) positions.[170] There are 180,000 jobs nationally for a folder (686.685-030).[171] Finally, there were 60,000 full-time positions for a light-duty cleaner (323.687-014).[172]

The ALJ posed a second hypothetical:

> Now, if the individual is further limited to occasional balance, kneel, crouch, crawl, and climb ramps and stairs, no climbing ropes, ladder or scaffold, no exposure to high-exposed places or moving mechanical parts, can stand and walk four hours in an eight-hour workday would need an option to alternate to sitting for every—for 20 to 30 minutes after every 20 to 30 minutes of standing or walking and would require a cane to ambulate on uneven terrain. Can that hypothetical individual perform any work, and, if so, could you give me a few examples with numbers of jobs for each occupation?[173]

The VE stated that this individual could perform the job of ticket taker, information clerk, or order caller.[174] There were 50,000 full-time ticket taker (344.677-010) positions nationally, but due to the individual being able to stand or walk only four hours in an eight-hour day, Ms.

---

[168] AR 69.

[169] AR 69–70.

[170] AR 70.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] AR 70–71.

Guillory would erode those numbers by twenty percent.[175] There were 75,000 full-time

information clerk (237.367-018) positions nationally, and the VE would erode those numbers by

twenty percent due to the four-hour standing or walking limitation."[176] Finally, there were 29,000

full-time order caller (209.667-014) positions nationally that this hypothetical individual could

perform, and the VE would erode these numbers by twenty percent for the same reason.[177]

The ALJ posed a third hypothetical:

> Now, if I changed the exertional level to sedentary, so assuming a hypothetical
> individual was limited to sedentary work as defined by the regulations, except
> occasional balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, no
> climbing ropes, ladders, or scaffolds and no exposure to high-exposed places or
> moving mechanical parts. What kind of [work] can the hypothetical individual
> perform, and if so could you give me a few examples?[178]

The VE stated that this hypothetical individual could perform the job of document preparer,

telephone quote clerk, and ticket clerk.[179] There were 10,000 full-time document preparer

(249.587-018) positions nationally, 60,000 full-time telephone quote clerk (237.367-046) positions

nationally, and 50,000 ticket clerk (219.587-010) positions nationally.[180]

The ALJ posed a fourth hypothetical:

> Now if that individual is further limited so they would need an option to stand for
> one minute after every 20 minutes of sitting and can remain on task while standing
> would those jobs still exist or apply or are there any other jobs that would?[181]

The VE responded that the document preparer, telephone quote clerk, and ticker clerk jobs

would remain available.[182] But, if the hypothetical individual needed to stand and walk for one

minute every twenty minutes, the above positions would remain available with an erosion of zero

---

[175] AR 70.

[176] AR 71.

[177] *Id.*

[178] *Id.*

[179] AR 71–72.

[180] *Id.*

[181] AR 72.

[182] *Id.*

to twenty percent.[183] The VE added that if the hypothetical individual were standing and walking and stretching more than ten percent of the time (six minutes per hour) and, not able to stay on task, then the positions above would not be available.[184] Moreover, if the hypothetical individual were limited to sitting a total of two hours in an eight-hour workday, that would not be considered full-time competitive employment.[185] Lastly, if this individual were to miss more than four days of work per month, he would not be working commensurate with expected standards by the employer.[186]

### 3.3 Administrative Findings

The ALJ issued an unfavorable decision on September 23, 2016.[187] The ALJ followed the five-step sequential-evaluation process to determine whether the plaintiff was disabled and concluded that he was not.[188]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since April 8, 2014, the application date.[189]

At step two, the ALJ found that the plaintiff had two severe impairments — obesity and osteoarthritis and allied disorders.[190]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (namely listings 1.02, 1.04, and 12.04).[191] She observed that while the plaintiff's physician indicated that he met listing 1.02, the physician noted that the injury did not involve a joint, and thus, he did not

---

[183] AR 72–73.

[184] AR 73.

[185] AR 74.

[186] Id.

[187] AR 14.

[188] AR 14–34.

[189] AR 19.

[190] Id.

[191] AR 21. 1.02: Major dysfunction of a joint(s) due to any cause. 1.04:Disorder of the spine. 12.04: Depressive, bipolar, and related disorders.

apply the listing criteria correctly.[192] Moreover, the ALJ concluded that, because the plaintiff testified that he often walked without a cane, he did not meet the "inability to ambulate effectively" requirement, as defined by the regulation.[193] She found that the evidence did not support a finding that the plaintiff's history of chronic affective disorder met the criteria in Listing 12.04.[194]

At step four, the ALJ concluded that the plaintiff had the residual-functional capacity (RFC) to perform light work as defined by the regulation.[195] The ALJ gave little weight to Dr. Chua's September 10, 2014 opinion (set forth on a one-page form report for Solano County Health and Social Services).[196] She said:

> The doctor cites an EMG/NCV study, but he did not attach a copy, and it does not appear in the medical evidence of record. The opinion is also inconsistent with the majority of physical examinations in the record, which often show good range of motion, 5/5 strength, and normal gait []. The form report does not require the doctor to support the opinion with objective and subjective findings, and is suitable for the Social Services purposes, but is not useful in deciding the Social Security issues. Further, the opinion impinges on an issue reserved for the Commissioner of the Social Security Administration (SSR 96-5p). For these reasons, the undersigned gives this opinion little weight.[197]

The ALJ also noted that Dr. Chua "appear[ed] to have become an advocate for his patient, rather than remaining a neutral observer of medical facts."[198] She concluded that "other medical opinions were more consistent with the longitudinal record" and gave the opinions of non-examining physicians, Dr. Zheutlin and Dr. Greene, greater weight than the opinion of Dr. Chua.[199]

---

[192] AR 21.

[193] *Id.*

[194] *Id.*

[195] AR 22.

[196] AR 26–27.

[197] *Id.*

[198] AR 27.

[199] *Id.*

The ALJ also gave the opinion of Dr. Glantz, an examining physician, less weight than the opinions of the non-examining physicians, Dr. Greene and Dr. Zheutlin.[200] She noted that Dr. Glantz "did not have the opportunity to review the entire record, including the claimant's written and spoken statements."[201] The ALJ added that the Dr. Glantz "afford[ed] the claimant greater consistency" than she [did].[202] Because the state agency medical advisors "had the benefit of more of the medical record," the ALJ gave their opinions greater weight than Dr. Glantz's opinion.[203]

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however his statements concerning the intensity, persistence, and limiting effects of the symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."[204] She cited inconsistent statements by the plaintiff regarding alcohol use.[205] She noted that findings of the plaintiff's conditions primarily depended on subjective statements from him and on examination findings that require subjective responses from him.[206] The ALJ determined that, besides the metal pellets in the plaintiff's left thigh and back, "there [were] no other strictly objective findings regarding cause for claimant's primary complaints of leg and back pain."[207] Ultimately, she concluded that the objective evidence supported a finding that the plaintiff had the residual-functional capacity to perform light work.[208]

At step five, the ALJ found that, given the plaintiff's age, education, work experience, and residual-functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.[209] She added that, even if the plaintiff were "limited to four hours

---

[200] AR 26.

[201] Id.

[202] Id.

[203] Id.

[204] AR 28.

[205] AR 25–26.

[206] Id.

[207] Id.

[208] AR 28.

[209] Id.

standing/walking during an eight-hour workday, as suggested by Dr. Glantz, that would not be outcome determinative."[210]

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

### GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §

---

[210] AR 29.

1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two**. Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff contends that the ALJ erred by (1) improperly rejecting the opinion of the treating and examining doctors, (2) improperly rejecting his own testimony at the hearing, and (3) not providing substantial evidence at step five of the analysis.

The court holds that the ALJ erred by discounting the opinions of Dr. Chua and Dr. Glantz, and by discounting the plaintiff's testimony. Because the ALJ's analysis was predicated on her findings, the court also finds that the step-five analysis was not supported by substantial evidence.

## 1. Whether the ALJ Properly Weighed Medical-Opinion Evidence

The plaintiff argues that the ALJ erred by failing to properly weigh the opinion of Dr. Chua, the plaintiff's treating physician, and Dr. Glantz, an examining physician.[211]

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927; *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial

---

[211] Mot. – ECF No. 23 at 8–11.

evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii) ) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[,and] the specialty of the physician providing the opinion . . . ." *Id*. (citing 20 C.F.R. § 404.1527(d)(3) – (6)).

**1.1 Dr. Chua**

The ALJ gave little weight to Dr. Chua's September 10, 2014 opinion because he did not attach a copy of the EMG/NCV study and because the opinion was "inconsistent with the majority

of physical examinations on the record."[212] She gave Dr. Chua's January 6, 2015 opinion less weight than the opinions of non-examining physicians Dr. Zheutlin and Dr. Greene.[213] The ALJ said that Dr. Chua "appear[ed] to have become an advocate for his patient," and "appear[ed] to have taken claimant's complaints at face value."[214] She said that Dr. Chua also failed to provide evidence that he saw the plaintiff seven years before.[215]

Dr. Chua's opinion is contradicted by Dr. Zheutlin's and Dr. Greene's opinions.[216] Thus, the ALJ was required to give specific and legitimate reasons supported by the record for discounting the opinion. *Reddick*, 157 F.3d at 725. The ALJ did not meet this standard.

The ALJ's first reason for discounting Dr. Chua's opinion — that he did not attach a copy of the EMG (electromyography)/NCV (nerve-conduction velocity) study — is not a specific and legitimate reason. Treating sources cannot be rejected solely because they "are not well-supported by medically acceptable clinical and laboratory . . . techniques." SSR 96-2p.[217] Furthermore, an ALJ is not entitled to reject the responses of a treating physician without specific and legitimate reasons for doing so, even where those responses were provided on a 'check-the-box' form, were not accompanied by comments, and did not indicate to the ALJ the basis for the physician's answers. *Trevizo v. Berryhill*, 871 F.3d 664, 677 n.4 (9th Cir. 2017). Dr. Chua documented an actual diagnostic study.[218] Dismissing the opinion for a clerical error is not a specific and legitimate reason to discount an opinion based on a treating doctor's long-term relationship.

---

[212] AR 26–27. An EMG/NCV study finds the presence, location, and extent of diseases that damage the nerves and muscles. Johns Hopkins Medicine, https://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/nerve_conduction_velocity_92,P07657 (last visited Mar. 12, 2019).

[213] AR 27.

[214] *Id.*

[215] *Id.*

[216] *Compare* AR 322–325 *with* AR 83–84 *and* 95–96.

[217] SSR 96-2p has since been rescinded (as of March 27, 2017) but was in effect at the time of Mr. Busby's ALJ hearing.

[218] AR 312.

The ALJ further held that Dr. Chua's opinion was inconsistent with the majority of the medical-physical examinations in the record. The ALJ said the record established the plaintiff had good range of motion and a normal gait, and this was contrary to Dr. Chua's opinion.[219] The record demonstrates that this is not the case. Multiple examinations by different doctors during different time periods demonstrate that the plaintiff walked with an altered gait.[220] For example, in April 2013, Dr. Ponath evaluated the plaintiff in San Quentin State Prison and said the plaintiff was "ambulating in an impaired manner consistent with pain."[221] In November 2014, Dr. Glantz noted that the plaintiff had an antalgic gait and walked with a limp favoring his left leg.[222] Dr. Glantz also noted that an 80-degree leg raise elicited low-back pain for the plaintiff.[223] Dr. Chua observed that the plaintiff was "walking with a limp" in June 2014.[224] In January 2015, Dr. Chua said that the plaintiff suffered from an inability to ambulate effectively and limitation of motion.[225] The ALJ's inaccurate assertion — that Dr. Chua's opinion is inconsistent with the longitudinal medical record — thus was not a specific and legitimate reason to give Dr. Chua's opinion less weight.

The ALJ also said that Dr. Chua "seem[ed] to have become an advocate for his patient."[226] The ALJ does not provide a basis for her assertion that Dr. Chua became an advocate who was not neutral observer of medical facts. The Ninth Circuit has held that ALJs "may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (quoting *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993)). Because the ALJ did not provide any evidence supporting her conclusion about Dr. Chua, her

---

[219] AR 27.

[220] AR 295, 317, 318, 319, 328.

[221] AR 295.

[222] AR 317.

[223] AR 318.

[224] AR 328.

[225] AR 323.

[226] AR 27.

assertion was no more than an assumption and was thus was not a specific and legitimate reason supported by the record for discounting his testimony.

The ALJ also cited Dr. Chua's taking the plaintiff's complaints at face value as a reason to discount his medical opinion.[227] "[W]hen an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). Dr. Chua's medical opinion is based on physical examinations and laboratory tests, not just on the plaintiff's self-reporting of his symptoms.[228] This was not a specific and legitimate reason to discount his medical opinion.

Furthermore, the ALJ gave Dr. Chua's opinion less than controlling weight without addressing the relevant factors for weighing a treating physician's opinion. *Orn*, 495 F. 3d at 631. The ALJ must consider the length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. *Id.* The ALJ did not discuss the fact that the plaintiff visited Dr. Chua at least eight times over the course of two years.[229] *See, e.g., Perry v. Colvin*, No. 14-CV-01411-JSC, 2015 WL 1090420 at *11 (N.D. Cal. Mar. 12, 2015) (a physician's two-year treatment relationship with the claimant was sufficient to entitle his opinion to "great weight"). Additionally, the ALJ did not address the fact that Dr. Chua's opinion was consistent with the diagnoses made by Dr. Glantz, the examining physician, of a left-thigh gunshot wound with muscular injury and weakness of the left hamstring with chronic pain and low-back pain and with the plaintiff's complaints of low back pain that radiated to his thigh.[230] The fact that the ALJ failed to consider the *Orn* factors undermines the ALJ's discounting of Dr. Chua's opinion.

---

[227] AR 27.

[228] AR 322–361, 408–413.

[229] AR 322–361, 408–413.

[230] AR 315, 319.

In sum, the ALJ did not provide specific and legitimate reasons supported by the record to discount Dr. Chua's medical opinion.

**1.2 Dr. Glantz**

The ALJ gave "some, but less, weight to Dr. Glantz than the weight given to the opinions of the state agency medical advisors [] who had the benefit of more of the medical record."[231] The ALJ said that Dr. Glantz "did not have the opportunity to review the entire record, including the claimant's written and spoken statements."[232] She noted that Dr. Glantz "afford[ed] the claimant more consistency that [she did]."[233] The ALJ's objections to Dr. Glantz's opinion also were based on the limited scope of Dr. Glantz's interaction with the plaintiff and on the plaintiff's being an unreliable source of information.

Dr. Glantz's opinion is contradicted by Dr. Zheutlin's and Dr. Greene's opinions.[234] Thus, the ALJ was required to give specific and legitimate reasons supported by the record for discounting the opinion. *Reddick*, 157 F.3d at 725. The ALJ did not meet this standard.

The ALJ's first reason for discounting Dr. Glantz's opinion — that Dr. Glantz "did not have the opportunity to review the entire record" — is not legitimate. It is not legitimate for an ALJ to reject an examining physician's opinion because the physician does not haver all medical records to review. *See Rivada v. Berryhill*, No. 17-CV-06895-LB, 2019 WL 26605 at *11 (N.D. Cal. Jan. 19, 2019). This reason is not legitimate because the Social Security Administration routinely orders and relies on consultative examinations, such as the one Dr. Glantz performed. Rejecting an examining physician's opinion on the ground that it was a one-time evaluation is "'legally erroneous' because '[t]he ALJ's rationale would render all examining opinions superfluous, and [it] is contrary to the requirement that the ALJ consider all relevant evidence, including the medical opinions of examining doctors.'" *Brown v. Berryhill*, No. 17-02834 (JCS), 2018 WL 4700348 at *17 (N.D. Cal. September 29, 2018) (citing *Thompson v. Berryhill*, No. 17-305 (BAT),

---

[231] AR 26.

[232] *Id.*

[233] *Id.*

[234] *Compare* AR 314–319 *with* AR 83–84 *and* 95–96.

2017 WL 4296971, at *5 (W.D. Wash. Sept. 29, 2017) (citing 20 C.F.R. § 416.945(a), which requires the ALJ to review "all of the relevant medical and other evidence")).

The ALJ's second reason for discounting Dr. Glantz's opinion — that Dr. Glantz "afforded the claimant more consistency that the [ALJ did]" — is not a specific and legitimate reason to discount the testimony either. "When an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* Dr. Glantz's opinion was based on a one-time, in-person examination of the plaintiff.[235] Dr. Glantz examined the plaintiff and considered his reported medical history, including his gunshot wound, chronic low-back pain, and hypertension, and drew conclusions that were consistent with the medical record.[236]

The ALJ did not provide specific and legitimate reasons supported by the record to reject Dr. Glantz's medical opinion.

### 2. Whether the ALJ Improperly Rejected The Plaintiff's Testimony

The plaintiff contends that the ALJ improperly rejected the plaintiff's symptom testimony.[237]

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. §

---

[235] AR 315.

[236] *Id.*

[237] Mot. – ECF No. 23 at 15–18.

423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester*, 81 F.3d at 834); see, e.g., *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300 at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, however his statements concerning the intensity, persistence, and limiting effects of the symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."[238] She cited past inconsistent statements by the plaintiff about his alcohol use.[239] She observed that there were "many examinations where he had normal strength, good range of motion, and ambulated normally."[240]

Though the ALJ cited the reasons why she finds the plaintiff to not be credible, she did not identify what specific portions of the plaintiff's testimony she found not fully credible. *Garrison*, 759 F.3d at 1014–15*; Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001); *see also* 42 U.S.C. § 405(b)(1) (noting the ALJ's responsibility to provide "a discussion of the evidence").[241] Furthermore, occasional symptom-free periods are not inconsistent with disability. *See Leidler v. Sullivan*, 885 F.2d 291, 292 n. 3 (5th Cir.1989); *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C. Cir. 1987). Finally, the plaintiff testified about his symptoms consistent with parts of the medical record, including the opinions of Dr. Chua and Dr. Glantz.

---

[238] AR 28.

[239] AR 25.

[240] *Id.*

[241] U.S.C. § 405(b)(1) was overruled in 2018, after the ALJ issued her decision.

In sum, the ALJ failed to make the required determinations to to reject the plaintiff's testimony.

### 3. Whether the ALJ's Step-Five Finding Was Supported by Substantial Evidence

The ALJ found that a light-exertional level was the "most limitation" she believed appropriate.[242] Because the court remands for a reweighing of medical-opinion evidence and claimant's testimony, and because the RFC assessment is built on these assessments, the court remands on this ground too.

## CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings consistent with this order.

This disposes of ECF 23 and 24.

**IT IS SO ORDERED.**

Dated: March 25, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[242] _Id._